# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ANTHONY SOS,

      Plaintiff,

                                        CASE NO.: 6:17-cv-890-KRS

v.

                                        <u>Dispositive Motion</u>

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, a foreign insurance
company

      Defendant.

_____

## STATE FARM'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

This case presents the question of whether State Farm Mutual Automobile Insurance Company ("State Farm") was required to include state sales taxes and certain fees to its insured, Plaintiff Anthony Sos, on the total loss claim involving his leased car. State Farm is entitled to summary judgment on Plaintiff's sole count for breach of contract because the Policy does not require the payment of sales taxes or title transfer fees to the Plaintiff on a total loss claim.

Under the Policy, State Farm was obligated to pay Plaintiff "actual cash value" after his leased car was determined to be a total loss following an accident. "Actual cash value" is the fair market value of the car, not the "replacement cost" as Plaintiff contends, and does not include sales taxes or title transfer fees. Thus, State Farm did not breach the Policy when it did not include state sales tax in its settlement of Plaintiff's total loss claim and is entitled to summary judgment. State Farm did, however, pay Plaintiff the full amount of fees, so State Farm is also entitled to summary judgment on that portion of Plaintiff's claim.

And regardless of whether the payment of sales taxes or fees was required, the record in this case shows that since the outset, Plaintiff has pursued this litigation for the sake of litigation. Almost immediately after Plaintiff filed this case, State Farm paid him everything he could conceivably claim to be entitled to—a fact that Plaintiff himself does not dispute. Moreover, as Plaintiff also seeks to pursue this case as a class action, State Farm identified any possible putative class members, conducted a thorough review of Florida claims during the applicable time period, and paid sales taxes to its insureds who did not receive those payments on their total loss claim. State Farm's payment of taxes and fees on total loss claims in Florida, whether in the normal course or through this remediation, stems from its business practices, and its desire to achieve significant operational efficiencies. Therefore, these actions in no way alter or effect the meaning or components of "actual cash value" in the Policy.

During the months that followed the remediation, Plaintiff aggressively litigated the case, demanding extensive discovery. Throughout all of this, however, Plaintiff has not produced any additional value to himself or the putative class beyond these payments. For example, he pursued nationwide class allegations that proved baseless, prompting him to voluntarily dismiss those claims. Similarly, he abandoned a Florida-only class of State Farm insureds with total loss claims involving owned vehicles, as he admitted there was no merit to that group either. There was no factual or legal basis for the case at the outset, no basis for the litigation to continue following State Farm's payments to the Plaintiff and other Florida insureds, and no basis for it to continue now. State Farm is entitled to summary judgment.

# I. FACTUAL BACKGROUND

## A. Plaintiff's Policy

Plaintiff was insured by State Farm when he was involved in an accident in 2016. Dkt. No. 27. Plaintiff's Policy (Form 9810A) (the "Policy") provides that in the event of a total loss, State Farm had "the right to choose to settle with you or the owner of the covered vehicle" by "[p]ay[ing] the ***actual cash value*** of the covered vehicle minus any applicable deductible."[1] Dkt. No. 27 at ¶ 18; Ex. A (emphasis added). "Actual cash value" (or "ACV") is not defined in the Policy. *Id.*[2] Notably, the Policy does not state that sales taxes or fees are included as components of actual cash value or are otherwise payable. *Id.*

## B. State Farm's Process for Handling Total Loss Claims

State Farm employs a multi-step claims-handling procedure for total loss claims in Florida:

- If a vehicle is determined to be a total loss, State Farm uses a market valuation tool provided by a third party vendor, AutoSource, to provide an initial valuation based on the vehicle's make, model, year, and certain features. Ex. C, Platt Dep. 46:18-25. The claims specialist then contacts the insured to discuss and potentially adjust the vehicle valuation. Ex. C, Platt Dep. 48:10-49:8.

- State Farm provides the Total Loss Settlement Tool ("TLST"), a graphical user interface in its Electronic Claims System ("ECS"), for claims specialists to use to calculate the total settlement figure of a total loss claim. Ex. C, Platt Dep. 43:7-15.

---

[1] The Policy covers a "***loss caused by collision*** to a ***covered vehicle***" and further specifies: (1) ***We*** have the right to choose to settle with you or the owner of the ***covered vehicle*** in one of the following ways: [ . . . ] (b) Pay the actual cash value of the ***covered vehicle*** minus any applicable deductible." Ex. A.

[2] State Farm had two applicable insurance Policies that governed Florida total loss claims during the relevant period. Exs. A, B. The other operative Policy in Florida during the relevant time period (Form 9810.7) provides that "Actual cash value is determined by the market value, age and condition at the time the ***loss*** occurred." Ex. B.

The claims specialists use the TLST to compile the actual cash value of the vehicle received from AutoSource and provided to the insured, along with any sales taxes and title transfer fees associated with the total loss. Ex. C, Platt Dep. 43:7-15, 49:11-21.

- After filling out the relevant TLST fields, State Farm claims specialists generate a letter to the insured that provides his or her "settlement offer." Ex. C, Platt Dep. 83:6-87:5. In response to the settlement letter, an insured may again approach State Farm to discuss the payment of the final figures. Ex. D, Graff Dep. 31:5-18.

Regarding the payment of taxes and fees for a total loss claim in Florida, it is State Farm's practice to pay taxes and title transfer fees on total losses. Ex. E, Graff Decl. ¶ 9. This was a business decision by State Farm, meant to gain operational efficiencies by standardizing Florida claims handling processes, even though the Policy and Florida law do not require these payments. *Id.* Because State Farm's claims handlers each settle total loss claims across multiple states, State Farm made this business decision to pay taxes and fees on Florida claims at the time of settling the claim for ease of training and consistency across the company. *Id.*

Specifically in Florida, State Farm's claims specialists added 6% sales tax plus any applicable city or county taxes and certain fees. Ex. C, Platt Dep. 49:11-21; 80:16-22. From 2012 to 2017, State Farm's claims specialists relied on publically available materials published by Florida governmental agencies to calculate the sales taxes and fees paid in conjunction with a total loss settlement. Ex. C, Platt Dep. 49:17-18; Ex. F. In 2017, State Farm altered this process and no longer accesses Florida-published materials for the sales tax and fee figures; it now relies on AutoSource to provide such figures to its claims specialists. Ex. C, Platt Dep. 173:1-4. State Farm's training materials and witnesses have stated consistently that sales taxes and fees are treated as separate and apart from actual cash value. Ex. C, Platt Dep. 55:3-13; Ex. D, Graff Dep. 12:22-23; Ex. G, SOSA904; Ex. H, SOSA966, Ex. I, SOSA2955; Ex. J, SOSA2978-2979.

During the proposed class period, and at the time of Plaintiff's accident, State Farm's TLST had a "business rule" in place for Florida that changed the tax field in the TLST to zero dollars when a claims specialist indicated that the claim was on a leased vehicle for some total loss claims. Ex. C, Platt Dep. 103:22-104:3. State Farm removed the business rule in mid-2017. Ex. C, Platt Dep. 85:1-4. The business rule did not affect all leased-vehicle total loss claims in Florida. Ex. E, Graff Decl. ¶ 8. Nor did it affect the payment of taxes on claims involving owned vehicles. Ex. K, Wilson Dep. 111:11-112:2. And it is undisputed that the business rule had no impact on the payment of title transfer fees in conjunction with a total loss claim for leased or owned vehicles. Ex. C, Platt Dep. 82:22-83:1; Ex. E, Graff Decl. ¶ 7.

## C. Plaintiff Anthony Sos's Claim and State Farm's Payments To Him and Other Insureds In Florida

Plaintiff had a car accident in January 2016, rendering his leased Lexus a total loss. Dkt. No. 27 at ¶¶ 19-20. He submitted a claim and agreed with State Farm that his Lexus was a total loss. *Id.* Plaintiff also agreed to the actual cash value for his loss of $36,902. Ex. L. State Farm did not pay any sales tax on the claim, but did pay $58.75 in fees. *Id.* State Farm then paid $33,563.92 to his leaseholder and $3,146.83 to Plaintiff. *Id.*

Plaintiff filed this case on May 15, 2017. Dkt. No. 1. He asserts a single claim for breach of contract with two components. First, he alleges that State Farm improperly omitted Florida sales tax from the actual cash value amount he received on his claim.[3] Dkt. No. 27 ¶

---

[3] Plaintiff sought relief for a putative class of insureds with owned vehicles as well as a nationwide class of State Farm insureds. *See* Dkt. No. 27. However, factual discovery has led Plaintiff to withdraw his nationwide class allegations, and he no longer seeks to represent such a class of State Farm insureds. Dkt. No. 100. Plaintiff has also abandoned his claims insofar as they implicate State Farm insureds with owned vehicles. Dkt. No. 70 at 5 n.2. His remaining

5. Second, he asserts that State Farm did not pay the appropriate amount in fees. *Id.* ¶¶ 23-24. In particular, Plaintiff asserts that he was paid "the license and title fees for a leased vehicle, as opposed to an owned vehicle," but was owed the fees for an owned vehicle, which is supposedly "a little more." Ex. M, Sos Dep. 74:24-75:5.

After Plaintiff filed this lawsuit, and before any party served discovery in this case, State Farm sent Plaintiff's attorneys a letter enclosing a check payable to Plaintiff in the amount of $12,151, which included amounts for taxes, fees, prejudgment interest, and attorneys' fees. Ex. U. Recognizing that the business rule was inconsistent with State Farm's general practices in Florida and hoping to resolve this case without the expense and burden of litigation, State Farm not only immediately acted to change this business rule, but engaged in a time consuming and thorough remediation process, discussed below, to identify and pay Florida insureds who may not have received sales taxes or fees as a part of their total loss settlement. Ex. E, Graff Decl. ¶ 10.

## II.    ARGUMENT AND ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *See id.* An issue of material fact

---

putative class allegations are limited to State Farm insureds from Florida who received total loss settlements for leased vehicles between 2012 and 2017. Dkt. No. 70 at 5.

is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* Ultimately, the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

"Under Florida law, interpretation of an insurance contract, including determination and resolution of ambiguity, is a matter of law." *Dahl-Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1381 (11th Cir. 1993) (citing *Sproles v. Am. States Ins. Co.*, 578 So.2d 482, 484 (Fla. 5th Dist. Ct. App. 1991)).

**B.**     **The Policy Does Not Require Payment of Taxes and Fees, So Plaintiff's Claim for Breach of Contract Fails**

Summary judgment is proper because State Farm did not breach the Policy in its handling of Plaintiff's claim. A breach of contract claim under Florida law requires three elements: (1) a valid contract; (2) a material breach; and (3) damages. *Friedman v. New York Life Ins. Co.*, 985 So.2d 56, 58 (Fla. 4th Dist. Ct. App. 2008). The interpretation of an insurance contract is normally a matter of law determined by the court. *Strama v. Union Fidelity Life Ins. Co.*, 793 So.2d 1129, 1132 (Fla. 1st Dist. Ct. App. 2001). Contract interpretation begins with the plain meaning of words used, and words are to be given their natural, ordinary meaning. *Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1251 (S.D. Fla. 2017). The contract terms must be interpreted "so as to give effect to the contract as a whole." *Id.* And for insurance contracts, "[a]lthough ambiguous provisions are construed in favor of coverage, to allow for such a construction the provision must actually be ambiguous." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005).

Plaintiff's breach of contract claim fails for several different reasons. First, the Policy is unambiguous in that it does not require payment of taxes and fees on a total loss claim. And even if the Court were to consider extrinsic evidence, the evidence concerning claims handling for total loss settlements proves that actual cash value does not include sales taxes and fees. Second, Plaintiff has presented no admissible evidence that supports his own, self-serving interpretation of actual cash value in State Farm's Policy. And third, recent decisions in cases against other insurers cited by Plaintiff are based on different policy language and actually highlight the reasons why the Policy does not require payment of taxes and fees.

1.  The Policy Is Unambiguous, and Actual Cash Value Does Not Include Taxes and Fees.

State Farm's obligations under Plaintiff's Policy are clear and succinct: "Pay the ***actual cash value*** of the covered vehicle minus any applicable deductible." Ex. A (emphasis added). Nowhere does the Policy compel or mandate that State Farm pay sales taxes or fees in conjunction with a total loss settlement, as Plaintiff admits. *Id.* Significantly, the contract does not contain a definition of actual cash value at all, and there is no indication or suggestion that "actual cash value" should be construed to mean "replacement value" or the "cost to replace a vehicle" as Plaintiff has argued. *Id.* And while State Farm had multiple policies in effect for Florida during the relevant time period, the varying language that described total loss settlements still prescribed the payment of "actual cash value" to insureds—nothing more, nothing less. Exs. A, B.

The absence of a definition of "actual cash value" in the Policy does not allow Plaintiff to insert his own definition. Rather, "ambiguity does not exist simply because a contract requires interpretation or fails to define a term." *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1548-

49 (11th Cir. 1996); *Lancer Ins. Co. v. Northland Ins. Co.*, No. 6:14-cv-490-ORL-41-DAB, 2014 WL 12628536, at *2 (M.D. Fla. Oct. 15, 2014) (same).  Florida courts have analyzed the meaning of actual cash value in the context of insurance policies and found the term to be unambiguous: "The expression 'actual cash value' is an often-used appraisal term, generally synonymous with 'market value' or 'fair market value.  Thus when the Policy provides for 'actual cash value' it means 'fair market value' . . . ." *Am. Reliance Ins. Co. v. Perez*, 689 So. 2d 290, 291 (Fla. 3d Dist. Ct. App. 1997) (citing Black's Law Dictionary 53 (4th ed. 1968)). The Eleventh Circuit has similarly ruled that the term "actual cash value" is unambiguous and means the "fair market value, of the item—that is, the fair or reasonable cash price for which the property could be sold in the market in the ordinary course of business." *United States v. Robertson*, 493 F.3d 1322, 1332 (11th Cir. 2007).

Equating "actual cash value" to mean "fair market value" is significant because "fair market value" is different than the "replacement cost of the vehicle," the definition Plaintiff advocates.  Under Florida law, "[r]eplacement cost insurance is designed to cover the difference between what property is actually worth and what it would cost to rebuild or repair that property." *State Farm Fire & Cas. Co. v. Patrick*, 647 So.2d 983, 983 (Fla. 3d Dist. Ct. App. 1994).  "[R]eplacement cost policies provide greater coverage than actual cash value policies because depreciation is not excluded from replacement cost coverage, whereas it generally is excluded from actual cash value." *Trinidad v. Fla. Peninsula Ins. Co.*, 121 So. 3d 433, 438 (Fla. 2013).  And with this discrepancy, Plaintiff hopes to impose the extra contractual obligation of paying amounts beyond those imposed by the definition of actual cash value.

Plaintiff's position runs counter to established law. Other insurance companies similarly treat actual cash value as a distinct concept from replacement cost, which may include taxes and fees, as have many courts interpreting the meaning of actual cash value. *See, e.g., Gill v. Progressive Direct Ins. Co.*, No. 2:06-CV-1151-MEF, 2008 WL 130774, at *4 (M.D. Ala. Jan. 10, 2008) ("While the policy does not define 'actual cash value', it is apparent . . . that 'actual cash value' would include an adjustment for the actual physical condition, and would not be merely equivalent to its replacement value."); *Seckinger-Lee Co. v. Allstate Ins. Co.*, 32 F. Supp. 2d 1348, 1358 (N.D. Ga. 1998) (actual cash value and replacement value are separate amounts); *Clark v. Clarendon Ins. Co.*, 2002-1314 (La. App. 3 Cir. 3/26/03); 841 So. 2d 1039, 1045-46 (finding that policy did not include sales tax despite actual cash value statute including sales tax).

What is more, Plaintiff may not recast State Farm's Policy language for his own benefit, especially where other courts have held actual cash value to be unambiguous and to contradict his preferred meaning. "[C]ourts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Taurus Holdings*, 913 So. 2d at 532. Here, the Policy limits an insured's benefits for a total loss settlement to the payment of "actual cash value," without any mention of the payment of sales tax and fees. Plaintiff cannot ignore an unambiguous Policy term simply because it does not comport with his theory of the case. *Dahl-Eimers*, 986 F.2d at 1382 ("Courts may not rewrite contracts or add meaning to create an ambiguity.").

The contractual interpretation analysis should stop there. But even if "actual cash value" was ambiguous, then the Court could examine extrinsic evidence to determine the

parties' subjective understanding of the contract.[4]  The evidence in the record shows that actual cash value does not include taxes and fees.  It is undisputed that actual cash value is a separate element from taxes and fees, or that taxes and fees are a separate element from actual cash value.  Ex. C, Platt Dep. 54:25-55:2; Ex. D, Graff Dep. 12:22-223.  State Farm's records underscore the same, and are not in dispute:

- State Farm's training materials distinguish between actual cash value, taxes, and fees. Ex. G, SOSA904; Ex. H, SOSA966, Ex. I, SOSA2955; Ex. J, SOSA2978-2979.  In addition, the materials explain that "A vehicle's mileage, condition, and prior damage should be considered in the evaluation of the vehicle's actual cash value."  Ex. I.

- State Farm's TLST distinguishes between the actual cash value for a vehicle and the amounts for taxes and fees.  Ex. C, Platt Dep. 74:11-75:3; Ex. N, SOSA2860, Ex. O, SOSA713.

- The settlement letter to insureds, including Plaintiff's own settlement letter, delineates between actual cash value, taxes, and fees.  Ex. L.

- State Farm's other operative Policy, Form 9810.7 confirms that "[a]ctual cash value is determined by the market value, age and condition at the time the loss occurred."  Ex. B.

Each of these documents outside of the Policy confirms that actual cash value is interpreted by State Farm as the "market value of the vehicle."  The Policy and records demonstrate that its practice in Florida is (and has been) that sales taxes and fees are not a component of actual cash value, consistent with its interpretation of the Policy and that "actual cash value" means market value of a comparable vehicle, then taxes and fees are added, less any deductible.

---

[4]  If the Court finds that the contract is ambiguous, then the Court may examine extrinsic evidence to determine the parties' subjective understanding of the contract.  *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014).

2.  No Facts or Law Support Plaintiff's Interpretation that Actual Cash Value Includes Taxes and Fees.

Plaintiff has adduced no admissible evidence to demonstrate that "actual cash value" means something more than the market value. In particular, as demonstrated by his interrogatory responses, the sole factual basis for his position that actual cash value means "replacement costs" and includes sales taxes and fees are his proposed expert witnesses, George Erickson and Randall McCathren. Ex. P, Plaintiff's Interrogatory Resp. No. 17. But as demonstrated by State Farm's *Daubert* motions, Erickson and McCathren's testimony as to trade usage and customs in the insurance industry is nothing more than inadmissible legal conclusions, which neither is qualified to offer. Without any facts supporting his interpretation of the relevant Policy, summary judgment is appropriate. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) ("A moving party discharges its burden on a motion for summary judgment by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case.").

Plaintiff's remaining arguments are illogical and not supported by the record. For instance, Plaintiff's experts contend that State Farm's Policy compels the payment of sales taxes and fees on leased vehicles because State Farm makes such payments on claims involving owned vehicles. Ex. Q, Erickson Rep. at 9-13. But the owned-vehicle versus lease-vehicle designation is both irrelevant given the claims and facts in this case, and ultimately baseless under Florida law.

First, the case does not involve claims involving owned vehicles—Plaintiff leased his car, and he dismissed any potential claims concerning owned vehicles. Additionally, Plaintiff cannot put forward any evidence that State Farm treats actual cash value in Florida differently

for leased and owned vehicles because the facts demonstrate that State Farm uses AutoSource to determine the market value of the vehicle, regardless of whether the vehicle is owned or leased. Ex. C, Platt Dep. 46:18-25. In other words, State Farm's procedures in Florida calculate the market value of the vehicle in the same way for owned and leased vehicles. *Id.*

Second, Plaintiff's attempt to prove that State Farm owes taxes and fees on leased vehicles by arguing that it must treat owned and leased vehicles equally is further flawed because Florida law does not treat leased and owned vehicles equally. There are two relevant distinctions between leased and owned vehicles under Florida law: (1) leased vehicles only pay prorated sales taxes for the term of the lease; and (2) transfer title fees are cheaper on a leased vehicle than on an owned vehicle. F.A.C. 12A-1.007 (13); Fla. Stat. § 319.32.

These laws and regulations affected how Plaintiff himself paid sales tax. In particular, Plaintiff admits that he did not pay full sales taxes on his Lexus, rather, he paid $33.57 in taxes monthly on his 3-year lease. Ex. R, Plaintiff's Resp. to RFA No. 7; Ex. S. And then he replaced his totaled Lexus with another leased vehicle, so he never paid full taxes on his replacement vehicle either. Ex. R, Plaintiff's Resp. to RFA No. 9. Ignoring this fact, Plaintiff demands that he is entitled to the full 6% of the actual cash value on his totaled Lexus, or $2,239, leaving him with a windfall of $1,097.62 in taxes that he never paid and never will pay.[5] Dkt. No. 27 at ¶ 15. In addition, owned vehicles are subject to a $75.25 fee for a new title, while a new leased vehicle is subject to a $54.25 fee. Fla. Stat. § 319.32; *see infra* § II.C.

---

[5] Plaintiff's lease began on March 14, 2013, and his total loss occurred in January 2016. Ex. S. Therefore, he paid $33.57 per month for approximately 34 number of months on his lease, totaling $1141.38 in taxes.

3. <u>Recent Cases Involving USAA and GEICO Further Highlight Why Taxes and Fees are Not Required Under the State Farm Policy.</u>

Throughout this case, Plaintiff has sought to analogize State Farm's obligations under the Policy with other cases filed against other insurers regarding the payment of sales tax and fees. Plaintiff frequently cites *Bastian v. United Services Automobile Association*, 150 F. Supp. 3d 1284 (M.D. Fla. 2015), which Plaintiff has asserted that "the Middle District has recently ruled on this exact issue." Dkt. No. 27 at ¶ 31; *see also* Dkt. No. 70 at 5, 9, 12, and 14. And Plaintiff's recent submission of supplemental authority from the *Roth v. GEICO* case argues that the *Roth* summary judgment order is "highly relevant." Case No. 16-62942, Dkt. No. 247, at 6 (S.D. Fla. June 14, 2018); Dkt. No. 99 at ¶ 7.

These decisions are easily distinguishable. Neither decision found that Florida law mandates the payment of taxes and fees on total losses as a matter of law. Instead those cases simply interpreted different contracts of different insurance companies. In *Bastian*, the court considered whether USAA's practice of paying only the sales tax actually incurred in the purchase of a replacement vehicle was a breach of contract. 150 F. Supp. 3d at 1287. As a result of this practice, when Bastian purchased a cheaper car to replace her wrecked vehicle, USAA paid her less in sales tax than it would have on the total loss vehicle. *Id.* Interpreting the language of USAA's insurance policy, the *Bastian* court found that USAA defined "actual cash value" as "the amount it would cost, at the time of loss, to buy a comparable vehicle," and "Loss" included "the cost to repair or replace the vehicle." *Id.* at 1288. USAA's policy required it to pay for a comparable vehicle, including taxes, and not the amount of her replacement vehicle. *Id.* at 1291.

Similarly, in *Roth*, the GEICO policy provided that an insured with a total loss settlement was entitled to "the replacement cost of the auto or property less depreciation or betterment." Case No. 16-62942, Dkt. No. 247, at 6. The court found that "settled law in the Eleventh Circuit, applying Florida law, is that *when* an insurer provides an actual cash value insurance Policy *covering the cost to repair or replace damaged insured property*, it must pay all of the costs that are included in the cost of replacement or repair of the property."[6] *Id.*

The Policy language in this case is different from both GEICO and USAA. Here, the Policy simply provides that State Farm will "[p]ay the actual cash value of the covered vehicle minus an applicable deductible." Ex. A. Actual cash value is not further defined, and nothing in the Policy mandates that State Farm pay taxes or fees on leased vehicles. *Id.* And unlike in *Bastian*, State Farm's Policy does not use the word "comparable," nor does it quantify the measure of actual cash value. *Id.* Accordingly, these cases are inapplicable. The Court cannot take the language from the GEICO policy or the USAA policy and incorporate it into the Policy. Rather, these are all separate contracts and State Farm is not a party to either the USAA or GEICO contract. Each contract must be interpreted separately based on its own language.

In addition, *Bastian* did not conclude that Florida Statute § 626.9743 requires the payment of taxes and fees, as Plaintiff argues. Dkt. No. 27 at ¶ 31. Rather, the court determined that the statute only required insurers "to pick one of four options for settling first-party motor vehicle total losses and those who pick option (a) pay sales tax." 150 F. Supp. 3d

---

[6] The *Roth* court relied on *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1305 (11th Cir. 2008), but in *Mills*, the insurance policy similarly defined actual cash value as "the cost to repair or replace property with new materials of like kind and quality" less certain depreciation.

at 1295. The plain language of this provision does not mandate an insurer's payment of taxes and fees for a replacement of a leased vehicle, and *Bastian* made no such pronouncement. *Id.*

Florida Statute § 626.9743(5) provides four possible methods for the adjustment and settlement of total losses, including, "The insurer may elect a cash settlement based upon the actual cost *to purchase a comparable motor vehicle, including sales tax*, if applicable pursuant to subsection (9)." Fla. Stat. § 626.9743(5)(a) (emphasis added). The *Roth* court implicitly agreed that the statute does not require payment of sales taxes and fees. *Roth*, Case No. 16-62942, Dkt. No. 247 at 9 n.5 ("GEICO's reliance on Fla. Stat. § 626.973(9) is unavailing, as the statute cannot limit coverage to less than what is provided for in the Policy."). While Plaintiff has suggested that such language compels an insurer's payment of taxes and fees, he is incorrect. Instead, the statute demonstrates that taxes are only necessary in association with the *purchase of a comparable motor vehicle*. Fla. Stat. § 626.9743(5)(a). Nothing about the statute imposes an obligation to pay taxes on leased vehicles—as the statute does not say anything about leased vehicles. *Id.; see Glass v. Captain Katanna's, Inc.*, 950 F. Supp. 2d 1235, 1243 (M.D. Fla. 2013) ("Where the statute's language is clear or unambiguous," it "must be given its plain and obvious meaning.").

    **C.**    **Even If Fees Are Owed as a Component of "Actual Cash Value," State Farm has Not Breached its Contract Because State Farm Paid the Fees Plaintiff Seeks.**

The Court should also grant summary judgment on the portion of Plaintiff's Breach of Contract claim for fees. State Farm paid Plaintiff $58.75 as a part of his total loss settlement

in July 2016.  Ex. L.  And while it is unclear how much he thinks he is entitled to,[7] Plaintiff asserts that this was not enough for title fees.  It was.

Florida's motor vehicle department charges "a fee of $70 for each original certificate of title, except for a certificate of title for a motor vehicle for hire registered under § 320.08(6) for which the title fee shall be $49. . .".  Fla. Stat. § 319.32.  A leased vehicle qualifies as a "motor vehicle for hire" and therefore is assessed $49, not $70, for any associated title transfer fee.  *Id*.  Both leased and owned vehicles are also assessed a $1 fee for the issuance of original or duplicate certificate, and a $4.25 fee for the application for issuance or transfer of certificate of title.  *Id*.  Thus, an owned vehicle would be subject to a $75.25 fee for a new title, while a new leased vehicle would be subject to a $54.25 fee.  *Id*.; Ex. F.  Ironically for Plaintiff, the court in *Roth*, held that for title fees for leased vehicles, $54.25 is the correct fee assessment for leased vehicles.  Case No. 16-62942, Dkt. No. 247, at 7 n.3 (S.D. Fla. June 14, 2018).

Here, Plaintiff leased his Lexus, and after the total loss, he leased another vehicle.  Ex. R, Plaintiff's Resp. to RFA No. 9.  So, even if State Farm were contractually obligated to treat fees as a necessary component of actual cash value, it was only required to pay $54.25.  State Farm paid Plaintiff more than that, $58.75.  *Id*.  Since State Farm paid Plaintiff an amount more than sufficient to cover these fees, there is no viable claim as it relates to fees.

---

[7] In his first interrogatory responses, he requests $75.25 in title fees and $4.60 in license transfer fees, but in his second interrogatory response, he appears to seek $79.25 in fees.  Exs. P, T.

**D.**     **The Claims in the Case are Moot Because State Farm Has Already Paid the Plaintiff and the Other Florida Insureds Affected by the Business Rule Everything They Could be Entitled To.**

Besides the deficiencies with the breach of contract claim as a matter of law, Plaintiff's claim is moot because State Farm has already paid him for all of the damages that he seeks in this case.  Further, Plaintiff no longer retains an interest in the putative class because State Farm has similarly compensated everyone in the proposed class.

In August 2017, State Farm paid Plaintiff $12,151.  Ex. U.  The check included an amount that compensated Plaintiff for his claims in this case, including sales taxes ($2,500), prejudgment interest ($251), and attorneys' fees ($9,000).  *Id.*  But Plaintiff's counsel never gave the check to Plaintiff.  Ex. M, Sos Dep. 92:20-93:18.  Rather, Plaintiff's counsel argued that this sum was "insufficient to fully compensate [Plaintiff] for the full extent of his damages."  Ex. V, Aug. 16, 2017 letter.  Plaintiff later testified that he did not know why his attorney would make this statement.  Ex. M, Sos Dep. 105:16-22; 106:24-107:12.  Instead he admitted that this sum would have fairly compensated him, other than what his attorneys may have incurred for attorneys' fees.  Ex. M, Sos Dep. 38:9-14.  To date, Plaintiff has offered no explanation as to how or why the amount paid to him was insufficient.

In addition to paying Plaintiff, State Farm compensated Florida insureds who may not have received sales taxes or fees as a part of their total loss settlement.[8]  Ex. E, Graff Decl. ¶

---

[8] As outlined in State Farm's opposition to class certification, counsel for State Farm approached Plaintiff's counsel to participate in this remediation process that would compensate State Farm's insureds.  Dkt. No. 85 at 6-8.  State Farm offered discovery to Plaintiff's counsel as to the remediation and to pay attorney's fees on top of the amount paid to State Farm's insureds, but Plaintiff's counsel demanded close to a million dollars for themselves.  *Id.* at 8.  The parties were unable to reach an agreement as to fees and negotiations broke down.  *Id.*

10. State Farm recognized that the business rule was inconsistent with its general business practices in Florida, and it made the decision to remediate these claims hoping to resolve this case without the expense and burden of litigation. *Id.* In October 2017, State Farm identified insureds from 2012 to 2017 who had leased vehicles and were not paid sales taxes through a search of its electronic claims database. *Id.* ¶ 6; Ex. W, Thorpe Decl. ¶¶ 4-6. State Farm then embarked on a file-by-file review to assess whether sales taxes had been paid. Ex. X, Butler Decl. at ¶¶ 6, 7. A team of claim specialists analyzed approximately 2,600 claims for leased vehicles and assessed whether to pay taxes or fees. *Id.* at ¶¶ 10, 18-19. If an individual had received no taxes, they were paid an amount equal to Florida's 6% sales tax plus any local sales tax, and if an insured had not received any fees, State Farm paid the insured $79.25. Ex. CC, Butler Dep. 31:17-32:3; 32:5-19. State Farm made payments in November and December 2017 to 2,321 insureds totaling $3,417,730. Ex. Y, State Farm's Interrogatory Resp. No. 11.

During the course of litigation, State Farm created and produced a list of all total losses in Florida during the entire class period. Ex. Z, SF_739. In February 2018, before Plaintiff filed for class certification, State Farm independently identified 1,174 claims from this list that had not received any sales tax for remediation. Ex. X, Butler Decl. ¶ 16; Ex. E, Graff Decl. ¶ 11. State Farm then initiated a second remediation, identical to the first. Ex. X, Butler Decl. ¶ 19. After reviewing the 1,174 claims, State Farm added another 704 claims to the list of Florida claims it had already remediated with sales taxes and fees. Ex. E, Graff Decl. ¶ 12. In these additional claims were 150 total loss claims from 2012. Ex. AA, SF_741. The remaining 470 claims were not remediated for a variety of reasons, including that many claims had received sales taxes and some were never settled as a total loss. Ex. E, Graff Decl. ¶ 14. State

Farm's continuing remediation efforts resulted in an additional $906,727.71 being paid to its insureds in March 2018.  Ex. Y, State Farm's Interrogatory Resp. No. 12.  All told, State Farm paid $4,324,457.74 to its insureds.  *Id.*

        1.    <u>No Case or Controversy Remains Because State Farm Has Fully Compensated Plaintiff.</u>

An actual controversy must exist at all stages of review, not merely at the time the complaint is filed.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997).  If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot.  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013).  Here, State Farm sent a check to Plaintiff well before the parties had engaged in fulsome discovery in the full amount that he seeks in this litigation.  Ex. U.  Plaintiff could have cashed it at any time to receive the full benefit of all damages that he seeks from State Farm.  *Id*.  Thus, no actual controversy exists between the parties, and Plaintiff no longer has a personal stake in the outcome of this litigation.  *Symczyk*, 569 U.S. at 72.

        2.    <u>Plaintiff Does Not Retain any Interest in the Proposed Class Since the Entire Proposed Class Has Been Remediated.</u>

Plaintiff will likely contend that his interest as a potential class representative allows the case to continue even though State Farm paid him everything he could possibly recover on his individual claim.  This is without merit.

First, State Farm tendered an unconditional payment to Plaintiff for what he sought in the case.  Ex. V.  He may still cash his check, so no settlement offer has lapsed.  With payment in hand, there is no basis for the case to continue.  Other courts have reached the same

conclusion. *See, e.g., Rueling v. MOBIT LLC*, No. CV-18-00568-PHX-BSB, 2018 WL 3159726, at *2 (D. Ariz. June 28, 2018) (finding the case moot when an employer deposited the full amount owed under an FLSA claim into plaintiff's bank account); *O'Neal v. Eagle Marine Contracting, LLC*, No. 16-CV-00401-KD-B, 2016 WL 5858694, at *2 (S.D. Ala. Oct. 5, 2016) (finding that the case might be moot after defendant transferred money into the plaintiff's bank account, if it represented the full compensation plaintiff sought). With the full payment in hand, Plaintiff's claim is moot, and there is no actual controversy left in this case.

The fact that Plaintiff is pursuing a class action does not change the result. Not only has the Plaintiff been compensated, the entire potential class has been compensated as well. As explained above and in State Farm's earlier-filed response to class certification, Dkt. No. 85, State Farm has already taken substantial steps to compensate any insured in Florida who may not have received sales taxes or fees for a total loss settlement. Ex. E, Graff Decl. ¶¶ 10-14. State Farm paid approximately 3,200 insureds an amount equal to Florida's 6% sales tax plus any local sales tax, and where appropriate, $79.25 in fees. Ex. Y; Ex. CC, Butler Dep. 31:17-32:3; 32:5-19. Over the course of the remediation, State Farm claims specialists reviewed every total loss claim identifiable in State Farm's Electronic Claims System during the class period which had not been paid taxes. Ex. E, Graff Decl. ¶ 12. Thus, Plaintiff does not retain any cognizable interest in the putative class he claims to represent.[9] *Compare Chen v. Allstate Ins. Co.*, 819 F.3d 1136, 136 (9th Cir. 2016) (finding that a tender of full payment

---

[9] Notably, State Farm affirmatively identified the insureds involved in the remediation with minimal input from Plaintiff. Ex. BB. The file review as part of the remediation followed from State Farm's own, independent assessment of its claims information. Ex. E, Graff Decl. ¶ 10.

might moot the named plaintiff's claim, but acknowledged that a class representative retains an interest in representing the class).

Admittedly, recent case law raise an issue in the class action context—whether a plaintiff who may no longer have a claim for damages still retains an interest in pursuing class relief. "Even if the individual claims are somehow deemed moot, the class claims remain live, and the named plaintiffs retain the ability to pursue them." *Stein v. Buccaneers Ltd. P'ship*, 772 F.3d 698, 704 (11th Cir. 2014). The Supreme Court's recent decision in *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 670-71 (2016), *as revised* (Feb. 9, 2016), relied on by the Plaintiff, is interesting, but not dispositive. There, the Supreme Court considered whether an unaccepted offer of judgment under Rule 68 which offered full relief to the plaintiff mooted a case. *Id.* Importantly, the Court determined that it did not, noting that the offer was rejected and plaintiff had allowed the time period for accepting the offer to lapse. *Id.* The case still presented a live controversy as "with no settlement offer still operative, the parties remained adverse; both retained the same stake in the litigation they had at the outset." *Id.*

Importantly, the Supreme Court left open the question of whether other types of payment to the plaintiff might moot a case. *Id.* at 672 ("We need not, and do not, now decide whether the result would be different if a defendant deposits the full amount of the plaintiff's individual claim in an account payable to the plaintiff . . ."). This case does not involve an offer of judgment—State Farm paid the Plaintiff the full amount he seeks; a fact of which there is no material dispute. And additionally, the entire proposed class has already been fully compensated though the remediation, so Plaintiff cannot retain any interest in representing the putative class because there is no putative class. This scenario was not present in *Gomez,* or

related cases.  *Cf. Stein*, 772 F.3d at 704; *Chen*, 819 F.3d at 1136.  Not only does Plaintiff lack

a live claim, the proposed class does not present any justiciable case or controversy because

all potential class members have been paid through the remediation.

### 3. The Facts Demonstrate that All Putative Class Members Have Been Paid Through the Remediation.

Cognizant of these realities, Plaintiff has focused on attacking the remediation, in the

hopes of uncovering additional putative class members who may not have received payment.

For instance, Plaintiff argues that State Farm failed to make an accounting of payments to

insureds, and accuses State Farm of not demonstrating that "the payments are full payments

owed to each insured."  Dkt. No. 96 at 4-5.  Plaintiff also questions whether State Farm

searched for 2012 total losses in its remediation efforts.  Dkt. No. 96 at 4.  And, Plaintiff

suggests that State Farm is "grant[ing] itself a full reverter from the settlement for all uncashed

checks."  Dkt. No. 96 at 5.[10]

These are baseless challenges. Through witnesses and documents, State Farm has

demonstrated that it paid the 6% state tax plus any applicable local taxes to all insureds through

the remediation.  Ex. CC, Butler Dep. 31:17-32:3; 32:11-19; Ex. DD, SF_749; Ex. EE, SF_750.

The second remediation includes over 150 claims from 2012, rebutting Plaintiff's concerns

about the remediation's completeness.  Ex. AA, SF_741.  And, as its witnesses testified, State

---

[10] Plaintiff also argues that the class members are entitled to prejudgment interest.  Dkt. No. 70 at 18.  This is addressed in State Farm's opposition to class certification, Dkt. No. 85 at 16, that prejudgment interest is not required through remediation unless a judgment has been entered, and none has been entered here.  *Albanese Popkin Hughes Cove, Inc. v. Scharlin*, 141 So. 3d 743, 746-47 (Fla. 3d Dist. Ct. App. 2014).

Farm has made extensive efforts to reach its insureds and has followed its claim procedure for any uncashed checks, or unreachable insureds. Ex. D, Graff Dep. 97:14-25; 98:1-25.

In short, Plaintiff no longer has any interest he could even arguably claim in the proposed class. And because State Farm has already paid him and all members of the putative class, Plaintiff's claims are moot, and State Farm is entitled to summary judgment.

**E.     State Farm Is Also Entitled to Summary Judgment on Plaintiff's Request for Injunctive and Declaratory Relief.**

Plaintiff's operative complaint does not include a specific request for injunctive or declaratory relief. Dkt. No. 27. But in class certification briefing, Plaintiff argues that he is entitled to such relief. Dkt. No. 70 at 14. Absent his pleading these counts, they are not even before the Court. If they were construed as live counts, State Farm is entitled to summary judgment on them as well because they raise the identical legal issue about actual cash value in the Policy, discussed above. Additionally, Plaintiff's claim is for money damages, so there is no legal or factual basis for declaratory or injunctive relief. *Peacock v. Cabreo-Muniz*, No. 2:12-CV-63-FTM-29DNF, 2014 WL 2573224, at *11 (M.D. Fla. June 9, 2014).

**III.     CONCLUSION**

For the reasons stated above, the Court should grant State Farm's Motion for Summary Judgement. State Farm does not owe sales taxes as a component of actual cash value. State Farm similarly does not owe fees as part of actual cash value, but is nonetheless entitled to summary judgment because State Farm paid the full amount of title transfer fees on Plaintiff's claim. Summary judgment is also appropriate because State Farm has already fully compensated Plaintiff and any putative class that may exist through the remediation.

Dated:  September 4th, 2018

Respectfully submitted,

/s/ Daniel F. Diffley
Daniel F. Diffley (admitted *pro hac vice*)
James B. Cash (admitted *pro hac vice*)
Cassandra K. Johnson (admitted *pro hac vice*)
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, Georgia 30309
Tel.: 404-881-7000

Johanna W. Clark
Florida Bar No. 196400
CARLTON FIELDS, P.A.
450 S. Orange Avenue, Suite 500
Orlando, FL  32801
Tel.: 407-849-0300
jclark@carltonfields.com

*Attorneys for Defendant State Farm Mutual*
*Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of September, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send a notice of electronic filing to all counsel of record.

/s/ Daniel F. Diffley
Daniel F. Diffley