**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ANTHONY SOS,

              Plaintiff,

v.                                    Case No:  6:17-cv-890-Orl-40KRS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

              Defendant.

_____/

## <u>ORDER</u>

This cause is before the Court without oral argument on the parties' cross-motions for summary judgment (Docs. 110, 111), and the responses (Docs. 112, 116) and replies (Docs. 123, 125) thereto. Upon consideration and review of the record as cited by the parties in their respective briefs, Plaintiff's motion (Doc. 111) and Defendant's motion (Doc. 110) are due to be granted in part and denied in part.

## I.    BACKGROUND

This dispute presents the question of whether Defendant State Farm Mutual Automobile Insurance Company ("**State Farm**") was required to pay sales tax and title transfer fees to its insured, Plaintiff Anthony Sos, on the total loss claim involving his leased vehicle. (Doc. 27). Plaintiff's Policy (Form 9810A (the "**Policy**")) provides that in the event of a total loss, State Farm has the right to pay the insured the "actual cash value" of his vehicle. (Doc. 112-2, p. 33). However, the Policy does not define actual cash value and fails to indicate whether sales tax or fees are included. (*Id.*).

The Policy defines "owned vehicles" as those that are owned by, registered to, or leased for a period of six months or more by the insured. (*Id.* at p. 5). Plaintiff signed a written lease for a period of thirty-six months, so his vehicle was considered an "owned vehicle" under the terms of the Policy. (Doc. 112-14, p. 3).

The "Physical Damages Coverage" section of the Policy governs total loss claims. (Doc. 112-2, p. 30). It provides that State Farm has the right to "pay the actual cash value of the *covered vehicle* minus any applicable deductible." (*Id.* at p. 33). "Covered vehicle," as defined within the section, means "your car" without any reference or differentiation as to whether the definition includes a leased, purchased, or financed vehicle. (*Id.* at p. 30).

State Farm engages in a multi-step procedure for handling total loss claims. (Doc. 110-4, 48:10–49:8, 43:7–15). First, AutoSource, a third-party vendor, provides an initial valuation needed to determine whether the vehicle should be deemed a total loss. (Doc. 110-4, 46:18–25; Doc. 112-7). Plaintiff contends that AutoSource determines the market value to purchase a vehicle, assessing the sale price of comparable vehicles to determine what it would cost to purchase a new vehicle rather than lease a new vehicle. (Doc. 111, ¶ 11). State Farm maintains that its initial valuation is based on the vehicle's make, model, year, and certain features. (Doc. 110, p. 3; Doc. 110-4, 46:18–25).

If the vehicle is deemed a total loss, the claims specialist contacts the insured to discuss the vehicle's initial valuation and arrive at an agreed value. (Doc. 110, p. 3; Doc. 110-4, 48:10–49:8). Next, the claims specialist calculates the total settlement figure by entering the agreed value into the Total Loss Settlement Tool ("**TLST**"), a graphical user interface embedded in State Farm's Enterprise Claim System. (Doc. 115, ¶ 8). Claims specialists use the TLST to compile the actual cash value of the vehicle, along with any

sales tax and fees. (Doc. 110, pp. 3–4; Doc. 110-4, 43:7–15). Finally, State Farm sends a settlement letter with the payment amount to the insured. (Doc. 110-4, 74:13). Importantly, State Farm does not condition payment on actual replacement of the total loss vehicle. (Doc. 115, ¶ 3).

From 2012 to 2017, State Farm had a business rule in place in Florida that changed the tax field, but not the title transfer field, in the TLST to zero dollars when a claims specialist indicated that the claim was for a leased-vehicle total loss claim. (Doc. 115, ¶ 10). However, the business rule did not affect the payment of sales tax on owned-vehicle total loss claims, nor did it affect claims in any state other than Florida. (*Id.*). State Farm removed the business rule in mid-2017 and began paying sales tax on total loss claims for leased vehicles. (*Id.*).

On January 28, 2016, Plaintiff was involved in a motor vehicle accident, causing his leased Lexus GS350 to be declared a total loss. (Doc. 112-16). Subsequently, State Farm issued payment of $36,710.75, $33,563.92 of which went to the lienholder while the remaining $3,146.83 went to Plaintiff. (*Id.*). Consistent with the business rule at the time, this amount did not include sales tax. (*Id.*). It did, however, include $58.75 in license and title fees. (*Id.*).

Plaintiff brings this putative class action lawsuit on behalf of himself and all others similarly situated, claiming that State Farm's failure to pay sales tax and the appropriate fees on leased-vehicle total loss claims constitutes a breach of contract. (Doc. 27, ¶¶ 48–51). Specifically, Plaintiff asserts that State Farm was obligated to pay Florida's 6 percent state sales tax plus applicable local sales tax, as well as title transfer fees in the amount

of $79.25. (Doc. 27, ¶¶ 15, 24; Doc. 111, ¶¶ 12, 16, p. 22). On March 1, 2018, Plaintiff filed a motion to certify the class (Doc. 70), which the Court has yet to rule on.

After Plaintiff filed this lawsuit, State Farm sent Plaintiff's attorney a letter enclosing a check payable to Plaintiff in the amount of $12,151.00, which included amounts for taxes, fees, prejudgment interest, and attorneys' fees. (Doc. 110-22). Plaintiff did not accept the tender. (Doc. 119, p. 16). State Farm has also engaged in a remediation process to identify and pay Florida insureds sales taxes and fees as part of their total loss settlement for leased vehicles. (Doc. 110-6).

## II.   STANDARD OF REVIEW

A court may only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment.  Fed. R. Civ. P. 56(c)(1)(A). "The burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). "The court need consider only the cited materials" when resolving a motion for summary judgment. Fed. R. Civ. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam)

(holding that a district court does not err by limiting its review to the evidence cited by the parties in their summary judgment briefs).[1]

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The Court's jurisdiction over this matter is premised upon diversity under 28 U.S.C. § 1332(d)(2). (Doc. 27, ¶ 7). Accordingly, the Court applies the substantive law of Florida, the forum state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Under Florida law, the interpretation of provisions of an insurance contract is a question of law properly decided on summary judgment. *Dahl–Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1381 (11th Cir. 1993).

## III.   DISCUSSION

Both sides move for summary judgment. Plaintiff argues that he is entitled to summary judgment because State Farm violated the Policy and Florida law by refusing to pay sales tax and the correct amount of title transfer fees. (Doc. 111). State Farm

---

[1]   "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

asserts that it is entitled to summary judgment because the Policy and Florida law are clear that neither sales tax nor title transfer fees are covered in total loss claims for leased vehicles and therefore Plaintiff cannot demonstrate a claim for breach of contract. (Doc. 110). Furthermore, State Farm maintains that summary judgment is proper because it already paid Plaintiff his requested amount and remediated the class claims. (*Id.*).

As a threshold matter, State Farm argues that the claims are moot because it already paid Plaintiff for all the damages he seeks in this case by sending him a check for sales taxes, prejudgment interest, and attorneys' fees. (Doc. 110, p. 18). However, Plaintiff never cashed the check. (*Id.*). As a general matter, "[a]n unaccepted settlement offer does not moot a plaintiff's case." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016). Even assuming State Farm offered complete relief to Plaintiff, his lack of acceptance of that offer means this case "remains a live case or controversy under Article III." *See Evey v. Creative Door & Millwork, LLC*, No. 2:15-cv-441, 2016 WL 1321597, at *6 (M.D. Fla. Apr. 5, 2016).

### A.    Breach of Contract Claim

It is hornbook law that a colorable breach of contract claim requires a material breach of a valid contract and damages. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992)). It is well-settled that absent ambiguity in a policy's language, "insurance contracts must be construed in accordance with the plain language of the policy." *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003). "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and another limiting coverage, the insurance policy is considered ambiguous."

*Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Ambiguous contract provisions are construed "liberally in favor of the insured and strictly against the insurer who prepared the policy." *Prudential Prop. & Cas. Ins. Co v. Swindal*, 622 So. 2d 467, 470 (Fla. 1993).

Liability in this case hinges on the meaning of "actual cash value." The Policy provides that State Farm has the right to "pay the *actual cash value* of the covered vehicle minus any applicable deductible." (Doc. 112-2, p. 33). Although the Policy does not define actual cash value, the lack of an explicit definition "poses no insoluble problem." *See Goff v. State Farm Fla. Ins. Co*, 999 So. 2d 684, 689 (Fla. 2d DCA 2008). When faced with a policy leaving actual cash value undefined, Florida courts have found the term to mean replacement cost minus depreciation. *Trinidad v. Fla. Peninsula Ins. Co.*, 121 So. 3d 433, 443 (Fla. 2013); *Goff*, 999 So. 2d at 690.

In *Goff*, the court interpreted the meaning of actual cash value as it appeared in a homeowner's insurance policy. 999 So. 2d at 686. Although the term was undefined, the court found that actual cash value meant "generally synonymous with 'market value' or 'fair market value'" *Id.* at 689 (quoting *Am. Reliance Ins. Co. v. Perez*, 689 So. 2d 290, 291 (Fla. 3d DCA 1997)). The court arrived at this definition by comparing actual cash value to replacement cost and explaining that the difference between the two terms is that actual cash value accounts for depreciation. *Id.* at 690. Accordingly, the court held that an actual cash value payment withholds depreciation but still "includes overhead and profit where the insured is reasonably likely to need a general contractor for repairs." *Id.* at 689 (citing *Gilderman v. State Farm Ins. Co*, 649 A.2d 941, 945 (Pa. 1994)); *cf. Perez*, 689 So. 2d at 291 (finding that actual cash value is generally synonymous with fair market

value and defining that as "the amount of money which a purchaser willing but not obligated to buy the property would pay to an owner willing but not obliged to sell it").

In *Trinidad*, the Florida Supreme Court also defined actual cash value as "'fair market value' or 'replacement cost minus normal depreciation.'" 121 So. 3d at 448 (citing *Goff*, 999 So. 2d at 689). The court opined that *Goff* was correctly decided, agreeing that overhead and profit are a necessary component of an actual cash value policy "where the insured is reasonably likely to need a general contractor for repairs." *Id.* Other courts have similarly defined actual cash value as replacement cost minus depreciation. *See Gilderman*, 649 A.2d at 945 ("Actual cash value is not defined in the policy. However, [] actual cash value consistently has been interpreted as meaning 'the actual cost of repair or replacement less depreciation.'"); *Ghoman v. N.H. Ins. Co.*, 159 F. Supp. 2d 928 (N.D. Tex. 2001) (holding that actual cash value means replacement cost less depreciation and includes overhead, profit, and sales tax). Considering this authority, the Court finds that actual cash value under the Policy means replacement cost minus depreciation.[2]

Next, this Court must determine what components are included in the replacement cost of a total loss leased vehicle—in other words, what costs is the insured reasonably likely to incur when replacing his vehicle. *See Goff*, 999 So. 2d at 690. Florida law imposes mandatory sales tax and title transfer fees for the replacement of all vehicles, whether leased or owned. Fla. Stat. § 212.05 (sales tax); § 319.34 (title transfer fee). As such,

---

[2] State Farm cites to business records such as training manuals, settlement letters, and other policies to demonstrate that actual cash value is interpreted by State Farm as the "market value of the vehicle." (Doc. 110, p. 11). However, given the unambiguous meaning of actual cash value, the Court declines to examine this extrinsic evidence to determine the parties' subjective understanding of the contract. *Faez v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014).

these taxes and fees are necessarily included in the replacement cost of a total loss vehicle. *See Bastian v. United Servs. Auto. Ass'n*, 150 F. Supp. 3d 1284, 1295 (M.D. Fla. 2015) ("Sales tax is an unavoidable component of the cost to buy a replacement vehicle.").

The Eleventh Circuit, applying Florida law, has held that sales tax is included in the cost of replacement under an insurance policy. *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1305 (11th Cir. 2008). In *Mills*, the Eleventh Circuit interpreted an insurance policy that defined actual cash value as "the cost to repair or replace property with new materials of like kind and quality, less [] depreciation." *Id.* at 1304. The court "easily conclude[d]" that the cost to repair or replace the property necessarily includes taxes, overhead, and profit. *Id.* at 1305. The court gave three reasons for its conclusion: (1) the definition of actual cash value did not "unambiguously exclude" overhead, profit, or taxes; (2) receiving payment was not tied to actual replacement of the property; and (3) an insurer is reasonably likely to incur these costs in making repairs. *Id.* at 1305–06.

Although *Mills* dealt with a contract that defined actual cash value, unlike the Policy here, the Eleventh Circuit's findings as to what costs are included in replacement cost is instructive to this Court. *See also Roth v. Geico Gen. Ins. Co.*, No. 16-62942, 2017 WL 5640740, at *3 (S.D. Fla. Jan. 24, 2017) (relying on *Mills* in holding that actual cash value defined in the policy as "replacement cost" necessarily includes sales tax and title transfer fees); *Bastian*, 150 F. Supp. 3d at 1295 ("The Court agrees with Eleventh Circuit's easily-reached conclusion [in *Mills*] that state and local taxes are part of the cost of replacing an item."). The Court finds that sales tax and fees are costs an insurer is reasonably likely to

incur in replacing his leased vehicle, and therefore are components of actual cash value under the Policy. *See Mills*, 511 F.3d at 1305.

The Court must now determine the amount of taxes and fees due on a total loss claim for a leased vehicle. Every motor vehicle purchased or leased in Florida is taxed at a 6 percent state sales tax rate plus applicable local taxes. Fla. Stat. § 212.05. However, Florida law imposes different amounts of title transfer fees depending on whether the vehicle is owned or leased. Fla. Stat. § 319.34. Florida's motor vehicle department charges a $70 fee for owned vehicles and a $49 fee for leased vehicles. *Id.* Both owned and leased vehicles are further assessed a $1 fee for the issuance of original or duplicate certificate, and a $4.25 fee for the application for issuance or transfer of certificate of title. *Id.* Thus, an owned vehicle is subject to a minimum of $75.25 for title transfer fees, while a leased vehicle is subject to a $54.25 fee. *Id.*[3]

The Policy does not distinguish between the actual cash value for owned or leased vehicles and provides no notice to insureds that their leased vehicles will be valued differently based on whether they were leased. (Doc. 112-2, p. 30–33). Rather, the Policy defines both owned and leased vehicles as "owned" vehicles. (*Id.* at p. 5). Furthermore, nothing in the Policy requires an insured to replace his total loss leased vehicle with another leased vehicle, or even to replace the vehicle at all. (*Id.*). As such, the Court finds that the Policy requires State Farm to treat its actual cash value payments for total loss

---

[3]   It is unclear what amount Plaintiff seeks in title transfer fees. At some points he mentions $75.25 (Doc. 111, p. 21), while at other points he mentions $79.25 (*Id.* at p. 22). The $4 difference between the two numbers appears to derive from license or tag transfer fees. (Doc. 110, p. 17 n.7; Doc. 119, p. 6 n.6). However, Plaintiff never moves for license or tag transfer fees. He instead seeks "title transfer fees" and even states that the "proper title transfer fee amount is $75.25." (Doc. 111, p. 21).

claims on leased vehicles the same as it would for total loss claims on owned vehicles, i.e., by paying sales tax and title transfer fees in the amount owed for the purchase of an owned vehicle.[4] *See Roth*, 2017 WL 5640740, at *3 (holding that leased-vehicle total loss claims should include title transfer fees in the amount owed for owned vehicles). Therefore, State Farm's failure to pay insureds with leased-vehicle total loss claims sales tax in the amount of 6 percent of the value of the vehicle plus applicable local taxes and title transfer fees in the amount of $75.25 constitutes a material breach of contract.

### B.   Injunctive and Declaratory Relief

State Farm also moves for summary judgment as to Plaintiff's claims for injunctive and declaratory relief, arguing that the claims are duplicative of his breach of contract claim. (Doc. 110, p. 24; Doc. 123, p. 8).[5] The Court agrees with State Farm. The Court's adjudication of the breach of contract claim required ruling on whether State Farm must include sales tax and fees in its actual cash value payments, rendering the declaration sought duplicative. *See Roth*, 2017 WL 5640740, at *3.

Furthermore, a claim for money damages for breach of contract—*not* a claim for declaratory or injunctive relief—is the appropriate vehicle for an insured to allege that his

---

[4]   Further, the Policy's failure to address limitations on the payment of sales tax and title transfer fees must be construed in favor of the insured. *See Swindal*, 622 So. 2d at 470; *see also Bastian*, 150 F. Supp. 3d at 1295 ("At best, the Policy says nothing on the topic, which the Court should construe in favor of the insured.").

[5]   Plaintiff failed to assert a claim for injunctive or declaratory relief in his Complaint. *See Wright v. Barnes*, No. 3:14-CV-479-J-39JBT, 2015 WL 9581765, at *2 (M.D. Fla. Dec. 30, 2015) (finding that a plaintiff must state what injunctive relief he seeks in the complaint); (Doc. 17). Plaintiff contends that the claim for injunctive relief was properly before the Court "in the form of the request for [Plaintiff]'s certification [of] a Rule 23(b)(2) injunctive relief class." (Doc. 119, p. 18 (citing Docs. 70, 96)). It is unnecessary for the Court to resolve whether the claims were properly brought via the Rule 23 motion.

insurer failed to fully compensate him. *Tiller v. State Farm Mut. Auto. Ins. Co*, 549 Fed. App'x 849, 855 (11th Cir. 2013) ("They complain that State Farm has not fully compensated them [but] these acts took place in the past and could be redressed through legal remedies. Thus, declaratory relief would not be available."); *see also B. G.H. Ins. Syndicate, Inc. v. Presidential Fire & Cas. Co.*, 549 So. 2d. 197, 198 (Fla. 3rd DCA 1989) ("For injunctive relief purposes, irreparable harm is not established where the potential loss can be adequately compensated by a monetary award. [P]laintiff's ability to obtain a money judgment [for] breach of contract [] is an adequate remedy at law."). Accordingly, summary judgment is due to be granted in favor of State Farm as to Plaintiff's claims for injunctive and declaratory relief.

### C. Class Claims

Both parties move for summary judgment as to the class. State Farm moves for summary judgment because "all putative class members have been paid through remediation." (Doc. 110, p. 23). Plaintiff moves for summary judgment as to the class because State Farm's remediation payments constitute a "confession of judgment." (Doc. 111, p. 22). However, this Court has yet to rule on class certification. As a result, any arguments by the parties on behalf of or related to the "class" are disregarded at this stage of the litigation.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.   State Farm's Motion for Summary Judgment (Doc. 110) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a. State Farm's Motion for Summary Judgment as to Plaintiff's claims for injunctive and declaratory relief is **GRANTED**.

    b. In all other respects, State Farm's Motion for Summary Judgment is **DENIED**.

2.    Plaintiff's Motion for Summary Judgment (Doc. 111) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a. Plaintiff's Motion for Summary Judgment as to his breach of contract claim is **GRANTED**.

    b. Plaintiff is entitled to damages in the amount of $2,239.12 in sales tax, which is 6% of the value of Plaintiff's total loss vehicle, plus applicable local tax; the amount of $75.25 in title transfer fees (offset by $58.75 already paid by State Farm), which is the minimum amount of title transfer fees that are due on the purchase of a replacement vehicle; and prejudgment interest.

    c. In all other respects, Plaintiff's Motion for Summary Judgment is **DENIED**.

3.    The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff Anthony Sos and against Defendant State Farm on Plaintiff's breach of contract claim (Doc. 27).

**DONE AND ORDERED** in Orlando, Florida on March 13, 2019.


PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties